## Tilden *v.* Metcalf.

In the Court below,

ELIPHALET METCALF, and the rest of the inhabitants of the Southerly District of the late First Society of the Town of Lebanon, *Plaintiffs*; DANIEL TILDEN, and nineteen others, *Defendants.*

THIS was an action of trespass.

The declaration stated, that the plaintiffs were, by sundry resolves of the General Assembly, vested with corporate powers, to build or repair the meeting-house in their district. That on the representation of sundry inhabitants of the southerly part of the first ecclesiastical society in Lebanon, to the General Assembly in October, 1802, shewing, that the General Assembly, in 1772, established the place of their meeting-house where it now stands, in conformity to an ancient agreement, and directed, that it should remain in that place; that it was then out of repair, but was a valuable house, and that the society would make no repairs upon it; the General Assembly, after hearing the parties, resolved—" That the inhabitants of said society, living south-" erly of a line established by the Assembly in May, 1732, " as a line for the future division of said society, be, and " they are hereby authorized, at any time hereafter, to tax " themselves for the repairs of said meeting-house; and the " inhabitants living northerly of said line, be exempted from " taxes hereafter laid for such repairs."—The declaration

A resolve of the General Assembly, authorizing part of a society to meet, chuse officers, levy taxes, and repair their meeting-house, will give them a right to sue for the destruction of such meeting-house, after they had repaired it.

Where an ancient agreement existed, and was sanctioned by repeated resolves of the General Assembly, that a meeting-house should remain in a particular place, and a part of the society to

society were authorized to, and actually did repair it; a vote of the society to relinquish their interest in it, will not justify the pulling of it down.

In such case, trespass *vi et armis* will lie.

And damages may be given beyond the mere value of the sums expended for repairs.

1806.

TILDEN
v.
METCALF.

also set forth the mode provided in that resolve, for warning a meeting of the inhabitants of the southerly district; and stated, that it authorized them, thus warned, to chuse a moderator, clerk, treasurer, and committee, to make repairs, &c. to lay taxes, to repair the meeting-house, to appoint a collector, who should proceed, and be accountable, in the same manner as the collectors of society taxes are. The declaration further stated, that there was a valuable meeting-house, worth $7,000, then, and long before, the property, and in the possession of the plaintiffs, which they were, by law, bound to support, and keep in repair, at their own expense; that under the foregoing resolves of the Assembly, they held their meetings, appointed their officers, laid their tax, and expended upon the meeting-house $600; and the defendants, well knowing the same, on the 26th of April, 1804, with force and arms, cut down, demolished, and carried away the timber, glass, boards, &c.

The defendants pleaded in bar, that the meeting-house was built about the year 1732, by a tax laid on the inhabitants of the society, and was, at sundry times, repaired by the society, and continued the property, and in the possession of the society, until the 27th of March, 1804, when the society, at a meeting legally warned, voted, and relinquished all their right in the meeting-house, in the words following: viz. "At a meeting of the first Ecclesiastical Society in "Lebanon, holden, by adjournment, on the 27th day of "March, 1804; a motion was then and there made, and "seconded, whether the society will relinquish all their "right and interest in the old meeting-house, and consent "and agree, that the same be appropriated towards build-"ing a new meeting-house, at, or near the centre of said "society, on condition, that the undersigned do, or will "obligate themselves, and give sufficient security to said so-"ciety, to build a new meeting-house at said centre, within "one year from the first day of April next, free from all "expense to said society; and that the people living nor-

" therly of said centre fund their proportion for the support
" of the ministry for ever.

Daniel Tilden,
Israel Loomis,
John Dewey,      } Building
Samuel Bailey,      Committee.
John Haywood,

" Voted to accept the foregoing propositions—*Yeas*, 75—
" *Nays*, 39."—And in pursuance of, and compliance with
this vote, said *Tilden*, and others, executed and delivered
their bond to the committee of the society, in the penal sum
of $ 10,000, for the use of the society ;—the condition of
which was, that before the 1st of April, 1805, they would
build a good commodious meeting-house, near the centre
of the society, for the use of, and free of expense to
the society, appropriating the old meeting-house to that
purpose ;—and that the people northerly of the centre should
fund their proportion for the support of the ministry for
ever :, which bond the committee accepted, in behalf of the
society, and lodged with the clerk for the benefit of the so-
ciety, who accepted thereof. And the materials of the old
meeting-house, being needed for the building of the new,
the defendants, under the licence of said *Tilden* and others,
and in pursuance of the vote of the society, quietly, and
peaceably collected, and took down the materials of the old
meeting-house, &c.

The plaintiffs replied, that in 1697, the General Assembly
granted, that five miles square of land purchased of *Owanecho*,
Sachem of Mohegan, and part of the propriety of land called
*Mason & Fitch's mile*, on the southerly side, between that and
Norwich, be incorporated as a town, by the name of *Leba-
non ;* and before the incorporation, it was agreed between
the inhabitants of the respective proprieties, that a town-
street should be laid out in the five mile propriety ; and
that the home-lots should be so laid out, and the meeting-
house erected in such place, and the minister's lot so laid out,
that the meeting-house and minister's lot should be equally

distant from the then line of the town of Norwich as they were from the northerly home-lots ; and that such lots were accordingly laid out, and the meeting-house erected where the meeting-house lately stood :—That in 1699, *Clark* & *Dewey*, two of the inhabitants of the town, purchased a large tract of land in the north-easterly, and north-westerly sides of the town, and knowing the aforesaid agreement, applied to the inhabitants of Lebanon to have their purchase annexed to the town ; which was objected to, lest it should create difficulties in future, with respect to the place of the meeting-house, and the ancient agreement and union be violated ; which *Clark* & *Dewey* then agreed, and engaged should never be the case ; stating, that their tract was large enough for a society, when settled ; and that they would lay out thereon a street for a village, and for a meeting-house : upon which terms and condition only, the inhabitants of Lebanon agreed to the application, and those lands were united to Lebanon accordingly ; and the street laid out, and the lands have ever since borne the name of the *Village.*

In 1724, they voted to build a new meeting-house in the same place with the former.

In 1727, Goshen society was set off from the south-westerly part of the first society ; and some difficulty then arising with the inhabitants of the village, and those of the northerly part of the five mile propriety, a committee was appointed, by the General Assembly, in 1731, who repaired to the first society, and affixed the place, where the old meeting-house then stood ; but the difficulties increasing, and the people of the village being unwilling to expend their money to build, at that place, when they soon expected to become a distinct society,—upon *their application*, and to promote peace, the society, in 1732, voted, that there should be a society in the northerly part of the society, (describing the line) after six years, when the people should see fit, and the General Assembly should allow thereof; and that those people should then have the money, which they should ad-

1806.

TILDEN
*v.*
METCALF.

tance to build the meeting-house, paid back to them, pro-
vided they should be set off in eighteen years. A commit-
tee was appointed to ask the aid of the General Assembly
to enforce the vote, who accordingly made application for
that purpose, in May, 1732 ; upon which, the General As-
sembly resolved, that if the inhabitants living north of the
line described in the vote of the society, should continue
six years a part of the society, and pay all parish charges,
and be, by the Assembly, set off a distinct society, which
the Assembly would be likely to do, if those inhabitants
should be of sufficient ability, any time within twelve
years, then the inhabitants south of the line should repay
to them all the money by them advanced for building the
meeting-house. And to ascertain how much they paid, it
was ordered, that the rates of the people of the north and
south line should be kept separate and distinct, and that the
former should be rocorded in the society records.

This was actually done, and peace restored, until 1767 ;
when some repairs being necessary, the northern inhabitants
procured a society meeting to ascertain whether the society
would then, upon their becoming a distinct society, repay
to them the money they had advanced to build the meeting-
house. The society voted, that upon their procuring, within
a reasonable time, an act of incorporation, they should be
repaid the money they had advanced, in an equal term of
time with that in which they had made the advancements.
But they neglected to do this ; and at a society meeting in
June, 1772, procured, by a majority of two, a vote to pull
down the meeting-house, and remove it to the centre of
travel in the society, including the village as part thereof.
Whereupon a large majority of the southern inhabitants
applied to the General Assembly ; who, in October, 1772,
appointed a committee to inquire into and report the facts,
and their opinion thereon. This committee, in May, 1773,
reported, that after hearing the parties, they found, that there
was an ancient agreement, that the meeting-house should
stand upon meeting-house hill, where it now stands ; and

that the agreement was entered into for good reasons, and had its influence from the beginning, and ought to be held *sacred and inviolable ;* that in ancient times, it was expected, that there would be a new society, in the northern part, called the village ; which had been so called from the beginning ; and a line had been kept up between the old and new proposed societies ; that when the present meeting-house was built, the place was fixed, and ascertained on the ancient agreement, and with views and prospects of such new society's being formed in a future time ; and provision was made to reimburse the people living northerly what they should pay towards building the meeting-house ; that the meeting-house ought to be and remain where it now stands, according to ancient agreement, and be kept in good repair, at the expense of the whole society ; and that when the village people shall be set off a distinct society, they ought to be repaid the sums by them advanced for building and repairing the meeting-house.

This report was approved and accepted ; and the assembly resolved, that the meeting-house should be fixed and remain on meeting-house hill, according to the ancient agreement, and be kept in repair at the cost of the whole society ; and if the northern inhabitants should think it for their interest to become a distinct society, according to the ancient agreement, and should be incorporated, the society should refund to them what they had advanced to build, and what they should advance to repair the meeting-house ; on condition they should apply to be incorporated within five years.

After this, the society remained quiet, and peaceable, until the year 1802 ; when the meeting-house again wanting repairs, the society refused to repair it : Whereupon a memorial was presented to the General Assembly, in October, 1802, stating the facts, and the doings of the society ; and after a full hearing, the Assembly passed a resolve, authorizing and empowering the inhabitants south of a line described to tax themselves for the repairs of the meeting-

house ; and exempting the inhabitants north of the line from such taxes ; authorizing also, the inhabitants south of the line to call meetings, to chuse certain officers, to lay taxes, to repair the meeting-house, and keep the same in repair, &c. &c. In pursuance of this resolve, the inhabitants of this district organized themselves, and levied their tax, and expended six hundred dollars upon the house.— After which, in February, 1803, the northerly people, claiming to be legal voters, with less than one third of the southern people, appointed a committee, to apply to the County Court, to fix a place for a new meeting-house ; and that committee did apply, and the Court upon hearing the facts, refused to interfere.

On the 27th of March, 1804, the people living northerly of the line of division, to the number of fifty-eight, thirty of whom were dissenters, and had taken up their certificates, voted to dispose of the meeting-house to *Daniel Tilden*, and others, styled a building committee, who were never appointed by the society, and had no legal existence. The meeting was warned to see what steps the society would take with the bell, lightning-rod, and meeting-house ; but it was not contemplated, by the plaintiffs, that the meeting was warned for the purpose of destroying the meeting-house. The meeting was adjourned to the 27th of March, for the special purpose of hearing the report of a committee, appointed to draw up a plan of reconciliation ;—and the vote specified was passed, when more than thirty legal voters from the south district were absent : Which vote is the same mentioned in the defendants' plea, &c.

To this there was a demurrer.

The Superior Court adjudged the plaintiffs' replication sufficient. Upon a hearing in damages, the defendants moved, that the value of the repairs, under the resolve of 1802, should be the only damages allowed. The plaintiffs offered witnesses to prove the value of the meeting-house,

L l

as a ground of damage ; to which the defendants objected. The objection was over-ruled ; the witnesses admitted ; and damages assessed at $ 2,300. The defendants thereupon filed their bill of exceptions.

The errors assigned were,

1. That the replication of the plaintiffs was adjudged sufficient.

2. That the Court admitted testimony as to the value of the meeting-house, as a ground of damages.

3. That the Court gave damages beyond the value of the repairs.

*Ingersoll,* and *A. Spalding,* for the plaintiffs in error.

1. The southerly district were, by the resolve of 1802, for certain purposes, constituted a corporation. They were empowered to appoint their officers, for the purpose of making repairs ; but not for the purpose of bringing suits. If a mob had burned the house, the action must have been brought in the name of the whole society. And the same must be the rule, where the suit is against individuals of the society.

It is said, this should have been pleaded in abatement. When an action is brought by a part owner of a personal chattel, that there are other owners must be pleaded in abatement. But the plaintiffs were not tenants in common with the defendants. Had the house been pulled down, before the repairs had been made, the plaintiffs surely could not have had a claim as tenants in common.

It is said, the act of Assembly will be abortive, if they can have no action ; but this is not to affect the rights of others, or vary the general law. Courts may lament the case of an

individual, barred of his claim, by the statute of frauds, or limitations, or usury ; but they will not, therefore, make void the law.

But this district is completely annihilated, by the subsequent act, making it a society ; and though that resolve is not pleaded, the Court will notice it as one of public concern.

If the plaintiffs could maintain any action, they should have brought an action on the case ; they having only the special property, and the society the general property.

2. The defendants justify under a vote of the society.— The ancient agreement is of no force, because the society has been often since divided, by the General Assembly ; the consideration, therefore, of that agreement, has failed.

The act of 1732, was founded upon propositions made by the parties, for their mutual benefit. The legislature did not then divide the society ; they only said, that it was probable they should, when a division should be requested. They proceeded on the ground, that they were one society. The same may be said of the act of 1773. The Assembly did not proceed on the ground, that the agreement was valid, but directed that *that house* should remain there,—not that every future building should be placed there. To that time, and until after the trespass complained of, they were one society.

In 1802, the same difficulties existed as to repairs ; and application was made to the legislature, who did not separate them, but authorized the southern people to tax themselves to repair the old meeting-house, not to build a new one ; and exempted the northern people from being taxed. They were still viewed as one society—the act did not divest the society of its separate property, nor deprive it of its corporate powers. It did not deprive individuals of the

right of voting, except upon the subject specially designated. It gave to the plaintiffs only a right to repair ; it permitted, but did not compel them to repair.   It gave them no separate interest ; nor did they gain any more right than individuals, who should repair by subscription, would have acquired.   The society, therefore, stand in the situation of every other society, and had a right to dispose of their property.   This meeting-house was built and repaired, until 1802, by a tax upon all the society, as others are ; and continued the property of the society.

The defendants are, therefore, justified, by the vote of the society, authorizing the pulling of it down.   This was the vote of the majority of the society ; and the vote of the majority must decide as to the disposition of the property, unless there is a special provision to the contrary.   Whether those persons, who had taken up their certificates, were legal voters cannot now be inquired into.   If this was a question, the vote should have been attacked at the time. Besides, the replication does not state, that the persons were disqualified from voting.   This vote, thus passed, must, therefore, be obligatory, if the terms of it have been complied with.   And upon a fair construction of the vote, it will appear, that the building committee were to obligate themselves, that the northern people should fund their proportion ; and that this should be a part of the condition of the bond.   And the society having voted to accept this bond, shows their understanding of, and gives their construction to, the vote.

3. If there is any recovery, it ought to extend to the amount of the repairs only.   And, therefore, any evidence as to the value of the meeting-house must have been irrelevant, and improper.   As the repairs are stated to have amounted to six hundred dollars, the value of the house must have been taken into consideration, in estimating the damages.

*Griswold*, and *Goddard*, for the defendants in error.

1. The plaintiffs are a corporation. In England, if the king grants *gildam mercatoriam*—a right to hold mercantile assemblies—the grantees, by this grant, are a corporation.(a)  Here, the legislature have given not merely a right to hold meetings, but to make contracts, to appoint officers, and to levy taxes.   And in the  statute respecting " commu- " nities," authority is given to all public bodies, recognized by  law,  to sue. (b)   The resolve of  1802 is similar to the sixth paragraph of the  act  respecting societies, which pro- vides for certain portions of societies. (c)

The act of 1802 would be worse than absurd without this protecting  power.   If they may repair, they  may  contract to repair ;  and if  they may contract, they must have power to enforce performance of such  contract, or  procure a re- compence for the breach of it.

Again, the declaration states the plaintiffs to be a corpora- tion ;  and the  defendants say,  the  plaintiffs ought to be barred, because the  plaintiffs are not a corporation.   Surely such an exception  can  only be taken in abatement.

2. The defendants cannot  justify themselves by the vote of the 27th of March, 1804.   This vote was void ;  because the  society  had no  right to  pull down  this meeting-house, especially after the County Court had refused to affix a place to build a new one.   Besides,  the  society  had  no  right to

(a) 1 *Black. Com.* 471, 473, 474

(b) *Stat.* 116, *edit.* 1796.  " That it shall and may  be lawful,  for all and every town, trustees for schools, proprietors of common and undivided lands,  grants, and  other  estates,  and interests,  and all other lawful societies or communities whatever, to sue, commence and prosecute  any suits, or  actions, for the maintaining, recovery, or defence of their grants, interests, and estates, in any court pro- per to  try the same."

(c) *Stat.* 402, 403, *edit.* 1796.

pass such a vote, after this ancient agreement, and the resolves of the General Assembly thereon. The legislature have reserved to themselves, for the great purpose of public instruction, a right to direct and controul public bodies. School districts are not, strictly speaking, corporations ; but if the majority will not have a school, and the minority apply to the General Assembly, the right of the Assembly to interfere, in such case, could not be doubted.

In this case, the Assembly interfered, at first, in 1732, upon the application of the northern people themselves. If their rights are divested, it is at their own request ; and they ought to be for ever estopped from complaining. By the terms then made, the southern people became the insurers of the meeting-house, and had it been burned within eighteen years, must have refunded to the northern people what they had paid. The Assembly have since only followed up, and carried into effect, what *they* requested.

By the acts of 1732, and of 1773, the southern people had the right of having the meeting-house remain there for ever. The northern people had the right only to meet there ; and idle, indeed, would have been these acts upon any other construction. The act of 1802, recognizes the former. It gives the custody, and possession, and property of the meeting-house to the southern inhabitants. The northern inhabitants are entirely separated as to the management and controul of the building, and exempted from paying for its repairs. The legislature never intended to give to one set of men the right to repair, and to another the right to destroy.

But this vote gave no authority to destroy this house ; it only relinquished the right and interest of the society to the old meeting-house. That right was only a right to meet in it for the purpose of public worship. This was all the defendants gained.

But if this is a vote to pull down, and the society had a right to pass it ; the defendants are not justified by it, because the terms of the vote have not been complied with.

By the vote, the northern people were to fund their proportion for the support of the ministry. This was not done ; and the guarantee of *Tilden*, and others, that it should be done, could not supply the want of it.

Further, the condition of this bond is against law. The statute expressly forbids the building of meeting-houses, without licence from the County Court ; and in this case, that licence had been actually refused. The defendants were, therefore, trespassers ; and this action lies against them, the injury being immediate and direct.

3. The record does not shew, that the Court gave the value of the meeting-house as damages ; only that they admitted its value to be proved as a ground of damages. The house was certainly as valuable to the plaintiffs as though they owned the whole ; and the real value of the repairs must depend in a great measure upon the value of the building upon which they were placed.

BY THE COURT,

The judgment was affirmed.