M. León Parra and María R. Widow of Guillermo León Parra, Plaintiffs and Appellees, *v.* Juan J. Gerardino, Defendant and Appellant.

No. 8032. Argued February 14, 1941.—Decided April 18, 1941.

*Felipe Colón Díaz,* for appellant. *M. León Parra, pro se,* and *Ramón A. Gadea* and *Rafael Hernández Matos,* for appellees.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the Court.

This case involves a claim for damages which the owners of a house allege were caused to them by their tenant in carrying out certain acts and in failing to comply with certain obligations which he expressly assumed on renting the property.

Plaintiffs allege that they are the owners of a house situated in Ponce which was rented to the defendant, it being stated by public deed that the house was used as living quarters; that it was oil painted; with its doors and windows, etc. in the manner stated, and that as the defendant altered its interior plan to use it for business, he bound himself to return it at the end of the lease in the same condition in which he received it.

It is further alleged that the defendant, in 1935, left the house in the specified conditions of deterioration, thereby causing the plaintiffs damages in the amount of $1,500 which he has refused to pay.

The defendant demurred to the complaint and asked for a bill of particulars which was granted, and he answered. He accepted the execution of the lease contract with the specifications stated in the complaint but he alleged that said contract was not in force in 1935. He denied that he left the house in the conditions stated by the plaintiffs and as a special defense he reproduced his demurrer of lack of facts to state a good cause of action and alleged in short that the house was returned in the same conditions in which it was delivered to him except what was destroyed or damaged by the passage of time and the San Felipe cyclone, the owner having refused to repair it and the defendant having had to leave it because it was useless for his business.

The case went to trial and after the same had begun, with the consent of the defendant, plaintiffs amended their complaint to conform it to the evidence. The defendant insisted on his demurrer and filed an amended answer. Finally, the case ended by a judgment condemning the defendant to pay the plaintiffs $800 for damages, plus costs and $200 for attorney's fees, and the defendant filed this appeal.

The appellant alleges that the lower court committed five errors; in dismissing his demurrer, in not permitting him to present evidence in regard to his special defense, in permitting the plaintiffs to offer evidence in regard to facts not alleged in their answer, in rendering judgment based on insufficient evidence and in imposing the costs and attorney's fees on the defendant, and in assessing the fees at $200.

Let us examine the first error. The demurrer for lack of facts sufficient to state a cause of action, filed at first against the complaint, was reproduced after the evidence had been presented. It is based principally on that the clauses

of the lease contract entered into in 1922 to mature in 1925, were not in force in 1935.

The execution of the contract is admitted. It is also admitted that said contract contained the following clauses:

"*First:* Manuel León Parra, as attorney-in-fact of Guillermo León Parra, leases to Juan José Gerardino y Maldonado, the property described and its appurtenances for a term of three years, from the first day of October of this year to mature on the 30th of September, 1925, for the rental of $40 payable at the end of each month in this City, in the home of Mr. León, who shall issue receipts. therefor.

"*Second:* The building leased has been used up to the present time as a dwelling, is oil painted and has its doors, windows, floors and other necessary interior furnishings such as kitchen, bathroom, sink, sanitary and light installations and has so been received by Mr. Gerardino.

"*Third:* As Mr. Gerardino has altered the interior conditions of the house to adjust it to the needs of his business, he binds himself to repair said house at the end of this lease so that it will be rendered useful as a dwelling; and therefore, he will replace the door blinds which face the street, which blinds he has removed substituting them by glass; he will remove the shelves which he has put on the interior walls of the house, repairing all nail holes or other holes made by the work which he has done in said house not only in the walls but also on the floors and ceiling of the same, leaving each room of the house painted in the same manner and with the same kind of paint as at present, that is, the rooms which are oil painted shall be painted with the same kind of paint and the same to be done with those that are painted with calcimine; in other words, any alterations which he has made in the said house, shall be corrected in such a manner that it will be in the same state and be the same as it is today; all subject to the taste and approval of Mr. León Parra and chargeable to Mr. Gerardino."

It was likewise admitted that upon the maturity of the contract, the lessee continued in the possession of the house with the consent of the lessor, the rental being reduced to $30 in 1930 and to $25 in 1932.

The lessor maintains that from these facts and the provisions of law, there arises an extension of the contract un-

der the same conditions in which it was executed, with the only partial modifications in regard to the rental, and the lower court agreed with him. The lessee alleges that the contract was not extended but that there was a novation and that therefore, the clauses of the same which are invoked were not in force when the house was delivered in 1935.

The contract of lease is fully regulated by law. All of title six of the Fourth Book of the Civil Code refers to it. It comprises Sections 1432 to 1495 of the 1930 edition. Section 1456 provides:

"Section 1456.—If, on the expiration of the contract, the lessee continues enjoying the thing leased for fifteen days with the acquiescence of the lessor, it shall be understood that there is an implied new lease for the time mentioned in sections 1467 and 1471 unless a notice has previously been given."

Sections 1467 and 1471, mentioned in the above copied Section, refer, the first, to the lease of rural properties and is not applicable to this case, and the second states that if no term for the lease contract has been fixed, it shall be understood to have been for years when the rental is paid yearly, for months when the rental is paid monthly, and for days when the rental is paid daily.

The only other express provision found in the law in regard to implied renewal is that in regard to such renewal, the obligations incurred by a third party, as surety to the principal contract, cease. This is not applicable to this case.

Referring to the significance and scope of provisions of the Spanish Civil Code similar to those which we have cited, the Commentator Martínez Ruiz, states as follows:

"If the lease has been made for a *fixed* time—it is literally stated in Section 1555—the same concludes on the established day without need of notice. Is this correct? If it were, two consequences would then follow: that there are leases without a settled period of duration and that in order to end them, a previous demand is necessary; a proposition which is openly in conflict with the fundamental pro-

visions which regulate this contract. According to the definition copied in Section 1543, the determination of the period of duration of the lease of things, which is the object of this Chapter, is an essential requisite of the contract. It is so indispensable that if it has not been agreed upon by the contracting parties, the law establishes it, and it is understood that it will last when dealing with rural property, during all the time necessary for the collection of the crops which the leased farm may yield in one year or which it may yield for once, no matter that two or more years elapse before they are collected; and when dealing with urban property, it is understood to last for years, months or days when an annual, monthly or daily rental should have been agreed upon. Section 1569 ratifies this when it vests upon the lessor the right to bring an unlawful detainer action against the lessee when the term agreed upon, or the one fixed by law to which we have just referred, has elapsed. The period of duration of the lease is in consequence always a fixed one. The parties *expressly* agree to it or the law establishes it in the absence of an express agreement; and in both cases, the contract comes to an end upon the termination of these respective terms without need of further demand.

"To what demand does Section 1555 refer then? The answer to this question is found, in our opinion, in the following Section, which is undoubtedly an exception to the general rule established by the former, and, according to which, if upon the termination of the contract the lessee should remain in the leased premises during fifteen days with the consent of the lessor, it is understood that there is an implied renewal for the term established by Sections 1577 and 1581. Thus, the lease contract ends *ipso facto* by the lapse of the term, unless—and this is the exception—an implied renewal be established by the stay of the lessee in the leased property with the consent of the lessor; but as this consent is implied, since it is derived from the lessor's silence and from his tolerance in permitting the lessee to remain in possession of the thing object of the lease contract, there is the need of some act which may destroy that presumption and we find this act in the notice given to the lessee that the lease contract is considered to have expired.

"We may imply from the above stated that the implied renewal is not a new contract but an extension of the original one, whose extinction is suspended by the tacit consent of the contracting parties —and not by a new term agreed upon by the parties, in which case it would have to be classified as a new contract, the product of a

new meeting of the minds—but for the term established by the law, in the absence of an express agreement, for the conclusion of the lease contracts of rural and urban properties.

"A distinguished commentator (Manresa, Vol. 10) not being in accord with this view, holds that the fact that the lessee remains in the leased premises, does not imply the permanency of the lease contract, which ends on the day agreed upon without need of further demand, it not being possible to extend or continue that which has already ended. He explains the need for the demand as the medium for making it clear that, assuming the permanency in the leased premises, it should not be understood that a new lease contract arises from it whose sole origin would be found in the implied consent of the parties; but he adds further on that the juridical relations created by the implied renewal will be regulated by what was agreed upon in the contract which gives rise to the renewal; which means that the contract has not ended, that it is still in full force and that its clauses and provisions are still in effect, with the exception of the one which refers to the time of its duration, which by implied consent is extended. On what authority, unless it be on that represented by the extended contract, would the lessor base the actions which he might be in the need to bring against the lessee during the time of the renewal? The Code itself ratifies, in the Sections to which we have referred, that the implied renewal, far from being an independant contract, implies an exception to the general provision which state that the lease contract should be understood as concluded for the sole fact of the lapse of the term agreed upon or of the supplementary one fixed by the law. . .

"Besides, the Supreme Court has stated in the Whereases of the two judgments which we insert further on that 'Section 1566 clearly indicates that the period of the *extension* has to be the one established in Sections 1577 and 1581', and that the period of time fixed by the Code in order that there may be an implied renewal, 'only produces the effect of *extending* the lease when there has not been a previous demand for its termination' ''. 9 Martínez Ruiz, *El Código Civil*, p. 573.

The comment is clear and conclusive. In our opinion, it contains the true meaning and scope of the law. And applying the law to the facts of this case, it is concluded that the 1922 lease was extended by the act of the lessee and the consent of the lessor, in the same terms in which it was ex-

ecuted, with the exception of the date of maturity which was substituted by the legal provision.

■ Was it then novated by the reduction of the monthly rental? We do not think so.

Obligations are extinguished, according to Section 1110. of the Civil Code (1930 ed.) by their payment or fulfillment, by the loss of the thing due, by the remission of the debt, by the merging of the rights of the creditor and debtor, by compensation and by novation.

Novation is, then, one of the ways of extinguishing obligations, but in our judgment the contract of lease executed in 1922 and extended by implied renewal in 1925, was not novated in 1930 and 1932 because the monthly rentals had been reduced.

Section 1158 of the Civil Code, (1930 ed.) provides that "in order that an obligation may be extinguished by another which substitutes it, it is necessary that it should be so expressly declared, or that the old and new be incompatible in all points." And in this case nothing was expressly said nor are the obligations incompatible in the least. It is the same obligation modified in one extent by the will of the contracting parties. The contract continued to subsist, but instead of paying $40 every month as rent, as in the beginning, from 1930 on, $30 were paid, and from 1932, $25. That is all. The assigned error was therefore, not committed.

■■ Altering the order followed in the assignment of errors, we shall proceed to study the third one, which involves the scope of a bill of particulars.

In the complaint it is alleged:

"7.—That the defendant in ceasing on November 19 of the present year in the possession as lessee of the aforesaid house, has left the ceilings thereof, and the door frames, with a great number of holes made by nails; many doors without door knobs and bolts, the paint and plaster of the walls, both interior and exterior, greatly deteriorated with large patches of putty, because some holes in the walls have been plastered up, and in other places, the old paint

shows in places and the rest of the room has another color, for the reason that, according to the belief and information of the plaintiffs, the paint was applied by the defendant or at his order, without removing some piece of furniture which stood against the wall where such duplicity of colors is apparent; that when the defendant left the house and removed the aforesaid furniture, the defect we have mentioned appears; on some of the other interior walls a great amount of ink spots appear. The floors of the rooms are rotten and sunken and a great number of the beams which support them are broken. In the walls of the kitchen and of the masonry range the plaster has come off in many places and the gratings are missing. One of the water-closets is no longer sanitary and offers a disgusting aspect both as to sight and smell and the other one of two which there were in the house, no longer exists, because the defendant destroyed it. The pavement of the yard is sunken in some places and the bathroom and all the tiles which cover the walls thereof are badly damaged.

‚ ''8.—That the plaintiffs, as soon as the defendant left the house aforesaid, required him repeatedly to correct the damages, and that he paid no attention and did not remedy the damages mentioned in the preceding paragraph.

''9.—That as a consequence of the conduct of the defendant, the plaintiffs have suffered damages by reason of the guilt and negligence of the defendant, which they estimate in the sum of $1,500, which has not been paid to the plaintiffs in whole or in part by the defendant or by anybody else.''

When a bill of particulars was requested, it was supplied as follows:

''The plaintiff, through his attorney, Raúl Matos, answers the motion for a bill of particulars filed in the case at bar, as follows: Sanitary installation and connection to the sewer system: $200. Rebuilding the range with four grates and installation of a sink: $40. Repairing fifteen doors with their frames at $5.00 each: $75. Repairing two windows at $7.50 each: $15. Repairing ceilings: $15. Installation of a new water-closet in the place of one which has disappeared: $25. Repair of the present water-closet: $15. Repair of the bathroom: $20. Installation of a new floor for all the building with $1\frac{1}{4}'' \times 4''$ planking and all the proper beam work, more or less 105 square meters at $3: $315. Installation of a gate including hardware: $50. Patching up the plaster all over the build-

ing: $25. Painting the whole building, inside and outside, three coats, around 726 square meters at 50¢: $363. Paving the yard: $12. Premium paid for workmen's compensation insurance: $30. Total: $1,200. Loss of rents because the house could not be occupied: $300. Total: $1,500.''

When at the hearing the plaintiffs presented evidence as to the gate, the premium for the workmen's insurance, and the rents which they failed to receive, the defendant objected because the complaint did not contain averments as to them. The plaintiffs maintained that although they did not specifically appear in the complaint, they appeared in the bill of particulars filed at the request of the defendant. He insisted in his objection and the court sustained the plaintiffs.

The nature and purpose of a bill of particulars are well expressed in the following paragraph of Corpus Juris, which contains the substance of a great number of court decisions. It says:

''A bill of particulars is properly an amplification of a pleading, designed to make more specific general allegations which appear therein, and to avoid a surprise at the trial. The function of a bill of particulars is to do justice in the case when that cannot be accomplished without the aid of such a bill, and that is to apprise the opposite party of the case which he has to meet. Thus the proper office of a bill of particulars is to inform the opposite party and the court of the precise nature and character of the cause of action or defense for which the pleader contends in respect of any material or issuable fact in the case and which is not specifically set out in his pleadings, and which cannot, in many cases, be given in the pleading without great prolixity. Further, it has been held that the function of a bill of particulars is for the aid of the court as well as of the parties, to expedite the trial, or to clarify, or define, or limit the issues in the case. It is not the office of a bill of particulars to supply material allegations necessary to the validity of a pleading, or to change a cause of action or defense stated in the pleading or to state a cause of action or defense other than the one stated. Nor is it the office of such a bill to furnish to defendant facts whereon to found an affirmative defense or which constitute a defense or offset for the other party.'' 49 C. J. 622–624.

See also our decisions in *Rivera* v. *Vahamonde,* 57 P.R.R. ___; *Colón* v. *Shell Co.,* 55 P.R.R. 575, 603; *García* v. *Aguayo,* 46 P.R.R. 329; *Drug Company of P. R., Inc.* v. *Susoni,* 43 P.R.R. 740; *Berio* v. *Rivera,* 42 P.R.R. 444; *Santiago* v. *Cuevas,* 41 P.R.R. 115; *Molina* v. *Rodríguez,* 40 P.R.R. 661; *James Thomas & Co.* v. *Florido,* 40 P.R.R. 1.

It may be seen, by examining the complaint and the bill, that although the particulars stated which had been set out in the bill do not specifically appear in the complaint, they form a part of the same transaction, that is, they arise from the same cause of action exercised. The nature of the suit, therefore, was not varied on account of them and the defendant had sufficient notice to prepare his defense. By that reason, from a liberal interpretation of the law, we do not think it possible to conclude that the court committed error in admitting the evidence.

 Let us examine the second error. It is based on that the court did not allow the defendant to present certain evidence in regard to his special defenses.

It appears from the record that when the defendant's expert, Hipólito Fitzpatrick, testified, the following took place:

"What was the floor of the house made of?

"In part, when I could see it, when I went there, I know that it is made of wood.

"What kind of wood?

"Pitch-pine.

"How long does a pitch-pine floor last?

"Hernández: We object.

"Gadea: We object.

"Hernández: The court's ruling is that there are two things here, one, the condition in which the house was, and another, the obligations assumed by Gerardino in the contract. When the expert Serra testified upon a question by my colleague as to how long the beams lasted, the rule was made that no questions could be made for that purpose.

"Colón: There is a special defense that 'the defendant, when he delivered the house to the plaintiffs, left it in the same condition

in which he received it except insofar as to what was damaged or destroyed by the lapse of time and by the damages suffered by said house during the cyclone known as "San Felipe" which took place in this Island in the month of September, 1928, and that if any loss or damage was suffered by the leased house, it was without the defendant's fault, because he used the same like a diligent father of a family.' We have this special defense and we have to prove it.

"Judge: Objection sustained.

"Colón: We take exception, Your Honor.

"We are going to make the same question as to the paint.

"An outside oil paint, how long does it last?

"Witness: Oil paint?

"Hernández: Objection.

"Judge: Objection sustained.

"Colón: With our exception.

"The pitch-pine beams, how long do they last?

"Hernández: Objection.

"Judge: Sustained.

"Colón: Exception."

In our judgment, the denial of the court was well grounded as to the paint because according to the clear terms of the contract, it should be replaced, but this is not so as to the wear and tear of the floor and the beam work.

The terms of the contract must be construed in accordance with the provisions of Section 1451 of the Civil Code (1930 ed.) to wit:

"The lessee must return the estate at the expiration of the lease in the same condition in which he received it, except what may have been destroyed or impaired by time or by unavoidable reasons."

Said terms do not bind the lessee to reconstruct the house. They must be indeed fulfilled in their letter and spirit but construed according to the facts and the law. A beam or a floor that becomes worn out through the lapse of time, which last as long as they possibly can, would not have to be replaced under the terms of the contract.

The evidence was therefore pertinent, and should have been admitted to be considered on its merits for the end of

determining definitely the damages. The error was committed.

■ The fourth error raises the issue of the sufficiency of the evidence. In sustaining that it is not sufficient, the appellant lays the greatest emphasis on the manner in which the expert of the plaintiffs testified, to show mostly the amount of the damages, copying from his testimony, as follows:

"How many hundred-weights of paint would be needed for painting the inside of said house?

"I do not have the note; I know that the total is. . .

"What are the measures of the house in the inside, you who are an engineer or an architect?

"I do not remember at present. I do not have my notes on hand.

"Don't you know the inside measurements?

"I have them in my notes, but I do not have them here.

"Outside, what are the measurements?

"I do not have the notes on me.

"Don't you know that either?

"I do not remember, I would be able to say if I could see my notes. (T. of E. p. 81.)

"You who are an architect, you must know about plumbing, do you buy plumbing, pipes?

"No sir, I do not buy supplies.

"Do you buy toilets?

"No, sir.

"How many feet of piping have to be installed?

"I have that in my notes but I don't have it here. (T. of E. p. 82.)

"How much wood has to be bought to repair those two windows?

"I cannot remember that either. That was last year, in June. I took those notes and I made that estimate. (T. of E. p. 87.)

"You said that the ceiling has to be repaired? What repairs have to be made to the ceiling?

"Witness: It has to be changed. I mean, some boards have to be changed. A great number of holes have to be covered.

"How many boards have to be changed?

"I cannot remember that.

"How many holes have to be repaired in the ceilings?

"I cannot specify that either. (T. of E. p. 88.)

"How many tiles have to be bought to fix that bathroom?

"Witness: I do not have the note here. I cannot tell you how many tiles; I can only tell you the amount from the result of those notes.

"Judge: But do you have those notes, could you bring them?

"I think I have.

"Colón: You have them written down?

"Yes.

"In your office?

"Yes.

"Can you ask for them on the phone?

"No, sir, there is nobody in the office.

"Could you go for them and bring them back in five or ten minutes?

"No, sir.

"Why not?

"I had my office in Sol Street and I moved it to my house and everything is packed up. When I became employed in the Forestry Service I packed all those papers and it would be a matter of searching all through them now. (T. of E. p. 89.)

"Judge: The party has a right to specification. Could you make a detailed list again?

"Yes, I could do them again.

"Colón: I would accept that the court give him a reasonable time, say half an hour, to search for those notes or make them again.

"Judge: He has already said that since he is employed in the Forest Service, all his papers are packed in boxes and that he has to search for them. Now, the worth that his testimony may have without details, that goes to the weight that the evidence may have in the case. (T. of E. p. 90.)

In its statement of facts and opinion, the trial court summarizes the pleadings, refers to the hearing and copies *verbatim* the record of the ocular inspection of the house in question, which contains a long and detailed description of the condition in which the court found the house. Then he says:

"The court, by the appraisal it has made of all the evidence presented and admitted, and especially because of the result of the

ocular inspection made by the judge, considers that the plaintiffs have satisfactorily proven the averments of their complaint and in particular those contained in the seventh paragraph of the same, *supra,* as to the condition in which the house was left by the defendant when he ceased in his lease. It has been proved to the satisfaction of the court that said house was in good condition to be occupied as a dwelling when it was leased to the defendant and that it has been because of the use to which it was devoted by the defendant during the years which he occupied it, that is, as a commercial establishment of electrical supplies and materials, that the greater part of the damages which are described in the record of the ocular inspection have been caused. The house has become useless for renting as a dwelling because the defendant did not make the necessary repairs in the same before deliverying it to the plaintiffs when he abandoned it. It has also been proved that the plaintiff, Mr. M. León Parra, performed all the repairs on the house which were requested by the defendant during the years that it was leased.

"The court is of the opinion that the damages aforementioned have not been caused by the lapse of time or by an inevitable cause, with the possible exception of some boards in the floors of the house and of the gate which has been described in the record of the ocular inspection.

"As to how much it would cost to repair the house so as to render it available once more for use as a dwelling, the plaintiffs' witness, Mr. Serra Gaztambide, an architect, testified that he had made an estimate of said cost and he detailed it as follows: Plumbing: $125. Repair of kitchen and sink: $60. Repairing the fifteen doors: $40. Repairing two windows: $15. Repairing the ceilings: $15. Repairing tiled bath: $40. Repairing floor and beam work: $260. Installing a new gate: $50. Repairing the plaster work: $75. Inside and outside paint: $275. Total: $955.

"Although there is no doubt that witness Serra Gaztambide made the aforesaid estimate in the month of June, 1936, when he testified he did not have with him the notes he made when he saw the house and neither could he specifically state the price of the materials necessary to make the different repairs, and which could convince the the court of the exactness of the individual and total cost which he assigned to the different repairs. Taking into consideration the testimony of the witness as a whole, and the unquestioned fact of the deplorable condition in which the house is, the court is of opinion

that the cost of the necessary repairs to again render it in conditions suitable for use as a dwelling will not go under $500. In fixing this amount, the court has also taken in consideration any damage which might have been caused to the house, especially the floors, gate and paint by the action of time or by inevitable causes.

"It has also been proved that it has been impossible to rent the house as a dwelling since the defendant left it on November 19, 1935, and the plaintiffs claim the sum of $300 for loss of rents which they have failed to receive computed at $25 a month which was the amount charged to the defendant on the latter part of the lease. The court considers the claim to be reasonable since said $300 only cover twelve months and said house has been vacant for more than eighteen months due to the condition in which the defendant left it."

Opposing the assigned error, the appellees cite the case of *Romaguera & Co.* v. *Castro & Co.*, 16 P.R.R. 406, wherein this Court decided as follows:

"When there are different elements of evidence which, taken together, have served as a basis upon which the judge has formed his conclusion as to the controverted facts, it is impossible for the appellate court to consider the different elements separately, by taking some of them into account and disregarding others, for it must always be presumed that the findings of the trial court on the evidence are correct, until the contrary is shown, and this showing to the contrary must appear from all of the evidence introduced and not from some of the facts alone."

But here the situation is different. In the *Romaguera* case, *supra*, the evidence offered was not all before this Court in a creditable manner, while here it is. The appellant in this case maintains that not only the statement of Gaztambide is insufficient but also the whole evidence offered by the plaintiffs to prove the amount of the damages.

Another of the cases of this Court cited to the same purpose by the appellees is that of *Díaz* v. *San Juan Light & Transit Co.*, 17 P.R.R. 64, 73, in which this Court cited Bouvier as follows:

"Let us see now what must be alleged and proven in cases of this kind.

" 'In personal and mixed actions (but not in penal actions, for obvious reasons) the declaration must allege, in conclusion that the injury is to the damage of the plaintiff and must specify the amount of damages;' Com. Dig. *Pleader* (C. 84); 10 Co. 116 *b*.

. . . . . . . . .

" 'To constitute a right to recover damages, the party claiming damages must have sustained a loss; the party against whom they are claimed must be chargeable with a wrong; the loss must be the natural and proximate consequence of the wrong.

" 'There is no right to damages, properly so called, where there is no *loss*. A sum in which a wrongdoer is mulcted simply as punishment for his wrong, and irrespective of any loss caused thereby, is a "fine" or a "penalty" rather than damages. Damages are based on the idea of a loss to be compensated, a damage to be made good; 11 Johns. 136; 2 Tex. 460; 11 Pick. 527; 15 Ohio 726; 3 Sumn. 192; 4 Mass. 115; 91 Pa. 302; 104 Mass. 353; 16 Q.B.D. 613. (See 142 N. Y. 391; Hale, Dam. 3.) This loss, however, need not always be distinct and definite, capable of exact description, or of measurement in dollars and cents. A sufficient loss to sustain an action may appear from the mere nature of the case itself. The law in many cases presumes a loss where a wilful wrong is proved; and thus also damages are awarded for injured feelings, bodily pain, grief of mind, injury to reputation, and for other sufferings which it would be impossible to make subject of exact proof and computation in respect to the amount of the loss sustained; 2 Day 259; 3 H. & M'H. 510; 5 Ired. 545; 2 Humphr. 140; 15 Conn. 267; 8 B. Monr. 432; 94 Mich. 119; 112 N. C. 323; 39 Ill. App. 495; 82 Tex. 33. The rule is not that a loss must be proved by evidence, but that one must appear, either by evidence or by presumption, founded on the nature of the case.' (1 Bouvier's Law Dic. 492.)' "

The citation contains the correct statement of the law in the matter. The appellees emphasize the part which says: "This loss, however, need not always be distinct and definite, capable of exact description, or of measurement in dollars and cents." And in truth, that part is the one less applicable to the facts of this case.

Here we have to do with specific damages to property which could have been described and appraised in dollars and

cents, as they were appraised and described in the complaint and the bill of particulars, and the evidence should have followed the averments and the bill.

It is evident that damages were caused, and it is also evident that the defendant is bound to compensate the damages he has caused. What is not evident is the amount of the damages, because the testimony of Gaztambide, the only evidence presented for that purpose, does not constitute the strong foundation required on which to base a definite conclusion on the point. The ocular inspection is proof of the existence of the damages, but not of the amount of the same in dollars and cents. The conclusion at which the court arrived to fix the item of $500 finds no support in the record.

■ The item of $300 for rents failed to be received during a year is neither well founded in its entirety, because the period is too long under the rule of mitigation of damages. See *Ortiz* v. *McCormick Steamship Co.*, 57 P.R.R.____. Only those rents failed to be received during a term reasonably necessary to require from the defendant the fulfillment of his obligation and to perform the repairs could be granted.

The fourth error was committed and as a consequence of it and of the second error, the fifth was also committed. It refers to the imposition of costs and attorney's fees.

Should the judgment be reversed and the complaint dismissed, or should it be reversed and a new trial ordered?

It seems to us that under the circumstances—the indubitable existence of the damages and the clear duty of compensating them—the latter is the more just solution. Then the parties will have a new opportunity of presenting their evidence as to the amount of the damages and the court of rendering a judgment which will fix them exactly.

The judgment is reversed and a new trial is ordered, to be held according to the terms of this opinion.

Mr. Justice Todd Jr., took no part in the decision of this case.